*In re* APPLICATION OF INTERNATIONAL TRANSMISSION
COMPANY FOR EXPEDITED SITING CERTIFICATE

Docket Nos. 303009 and 303040. Submitted October 9, 2012, at Lansing.
Decided November 6, 2012, at 9:00 a.m. Reversed in part, 493 Mich
947.

International Transmission Company (ITC) filed an application in
the Public Service Commission (PSC) for an expedited siting
certificate to construct a wind energy transmission line pursuant
to part 4 of the Clean, Renewable, and Efficient Energy Act, 2008
PA 295, MCL 460.1141 *et seq.* The Association of Businesses
Advocating Tariff Equity (ABATE), the Michigan Public Power
Agency (MPPA), and the Michigan Municipal Electric Association
(MMEA) intervened, arguing that ITC's proposed transmission
line did not meet the requirements of 2008 PA 295; that 2008 PA
295 did not provide authorization for construction of a transmis-
sion line because that authorization was reserved to 1995 PA 30,
which governs the location and construction of major electric
transmission lines; and that 2008 PA 295 was unconstitutional.
The PSC issued an order granting ITC's application, ruling that
the proposed transmission line met the requirements of 2008 PA
295 and declining to resolve the alleged conflict between 2008 PA
295 and 1995 PA 30. The Court of Appeals consolidated the appeal
of ABATE in Docket No. 303009 with that of MPPA and MMEA in
Docket No. 303040.

The Court of Appeals *held*:

1. The PSC's interpretation that issuance of an expedited
siting certificate under part 4 of 2008 PA 295 authorized construc-
tion of a wind energy transmission line was reasonable; however,
because this interpretation created an exception to the mandatory
nature of 1995 PA 30, it constituted an amendment, alteration, or
revision of 1995 PA 30 and therefore violated the reenactment and
publication requirements of Const 1963, art 4, § 25. Because no
exceptions to these requirements applied, 2008 PA 295 must be
construed to require a party seeking to construct a wind energy
transmission line under its provisions to also comply with the
requirements of 1995 PA 30 to avoid rendering 2008 PA 295
unconstitutional. Under 1995 PA 30, an independent transmission
company that plans to construct a major transmission line in

Michigan must submit a construction plan to the PSC and be granted a certificate of public convenience and necessity before beginning construction. The provisions of 2008 PA 295 set forth a process under which the PSC can issue expedited siting certificates to facilitate the transmission of electricity generated by wind energy conversion systems in wind energy resource zones. While 2008 PA 295 does not expressly state that a siting certificate authorizes construction, the PSC's ruling that it did was reasonable in light of the definitions of siting and construction, the fact that 2008 PA 295 provides that a siting certificate conclusively establishes public convenience and necessity, the fact that the application process itself arguably constitutes construction given the definitions of siting and construction, and the implication in MCL 460.1157 that construction is permitted with an expedited siting certificate. The argument that the conflict between this interpretation of 2008 PA 295 and 1995 PA 30 could be resolved by applying the supremacy clause in 2008 PA 295 fails because that clause applies only to conflicting local legal authority, whereas 1995 PA 30 provides that it controls in any conflict between it and any other state law, thus rendering inapplicable the rule that a more specific, later-enacted statute controls in the event of an irreconcilable conflict between two statutes. Therefore, by allowing a transmission company to begin construction of a transmission line without complying with the mandatory provisions of 1995 PA 30, 2008 PA 295 violated Const 1963, art 4, § 25, which states that no law shall be revised, altered or amended by reference to its title only and requires that the section or sections of the act altered or amended be reenacted and published at length. The exception to these requirements for laws that amend only by implication does not apply given that the conflict between 1995 PA 30 and 2008 PA 295 was not accidental or inadvertent but rather resulted from the Legislature's knowledge of 1995 PA 30 and its intent to abrogate that rule with respect to specific wind energy transmission lines, as evidenced by the fact that 2008 PA 295 included explicit references to and adopted definitions from 1995 PA 30. Likewise, the exception to the requirements of Const 1963, art 4, § 25 for laws that are complete in themselves does not apply because, comparing its provisions with the prior laws left in force, 2008 PA 295 is not complete on the subject with which it deals given that an alternative mechanism for permitting construction of transmission lines exists in 1995 PA 30. Whether the reenactment and publication requirements of Const 1963, art 4, § 25 would have been unduly burdensome was not a consideration when determining whether that provision was violated. The only way to interpret the statutes harmoniously without rendering 2008 PA 295 uncon-

stitutional was to conclude that, regardless of whether a siting certificate is obtained under 2008 PA 295, 1995 PA 30 mandates compliance with its provisions relating to public convenience and necessity before construction could commence. Although this constituted an absurd result that was manifestly inconsistent with the legislative intent to create an expedited process, the rule that courts should construe statutes to avoid absurd results cannot render an unconstitutional act constitutional.

2. The decision to require a party seeking to construct a wind energy transmission line under 2008 PA 295 to also comply with the requirements of 1995 PA 30 applies prospectively. While judicial decisions are generally given full retroactive effect, a decision that clearly establishes a new principle of law may be given prospective application after consideration of (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice. Although the Court of Appeals interpreted 2008 PA 295 in the only manner possible without rendering it unconstitutional, because that result was absurd, clearly contrary to the intent of the Legislature, and a departure from the reasonable but erroneous interpretation adopted by the PSC, its holding was akin to the announcement of a new rule of law, rendering consideration of prospective application appropriate. First, prospective application would further the purpose of the new rule, which was to correct an error in the interpretation of 2008 PA 295 to prevent it from being rendered unconstitutional. Second, ITC and other companies invested substantial resources in reliance on the reasonable assumption, and the PSC's ruling, that construction was authorized under 2008 PA 295 without the necessity of compliance with 1995 PA 30. Third, prospective application would minimize the effect of the decision on the administration of justice by avoiding additional litigation regarding ITC's completed and ongoing construction, preventing the use of PSC resources on duplicative reconsideration of evidence under 1995 PA 30 that had already been considered and used to authorize construction under 2008 PA 295, and providing the Legislature the opportunity to fix the absurd result created by this required interpretation without stopping the ongoing construction of transmission lines that are necessary to help energy companies meet the 2015 deadline for green energy mandates. The decision was given immediate effect pursuant to MCR 7.215(F)(2) and applies only to applications brought under 2008 PA 295 on or after the date of this opinion.

3. The PSC's conclusion that the transmission line proposed by ITC was of an appropriate capability was not erroneous. MCL

460.1153(3)(d) requires a proposed transmission line to be of appropriate capability to enable the wind potential of the wind energy resource zone to be realized. The proposed transmission line had a 5,000 MW capacity, and the estimated wind potential in the region was between 2,367 MW and 4,236 MW. A planned transmission line should not be built to a size that may become overloaded. MCL 460.1153(3)(d) does not authorize a transmission line that will realize some, most, or even a reasonably anticipated amount of wind potential; rather, the line must be capable of enabling the realization of the wind potential. Any number less than the maximum estimated capacity arguably would have failed to meet this standard. The fact that ITC's transmission line would exceed the amount necessary to meet the required renewable energy standard is in keeping with the Legislature's mandate of a minimum rather than a maximum amount.

4. The challenge to the PSC's conclusion that ITC's proposed route was feasible and reasonable was unpreserved and unsupported and therefore abandoned.

PSC order affirmed in result.

1. PUBLIC UTILITIES — CONSTRUCTION OF WIND ENERGY TRANSMISSION LINES — EXPEDITED SITING CERTIFICATES — SUBMISSION OF CONSTRUCTION PLANS — CERTIFICATES OF PUBLIC CONVENIENCE AND NECESSITY.

An independent transmission company seeking an expedited siting certificate for construction of a wind energy transmission line under part 4 of 2008 PA 295 must submit a construction plan to the Public Service Commission and be granted a certificate of public convenience and necessity pursuant to 1995 PA 30 before beginning construction.

2. PUBLIC UTILITIES — CONSTRUCTION OF WIND ENERGY TRANSMISSION LINES — EXPEDITED SITING CERTIFICATES — PROSPECTIVE APPLICATION OF JUDICIAL DECISIONS.

Judicial decisions are generally given full retroactive effect; a decision that clearly establishes a new principle of law may be given prospective application if warranted by consideration of (1) the purpose to be served by the new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice; the decision requiring independent transmission companies seeking an expedited siting certificate for construction of a wind energy transmission line under part 4 of 2008 PA 295 to also comply with 1995 PA 30 before beginning construction applies prospectively.

3. PUBLIC UTILITIES — CONSTRUCTION OF WIND ENERGY TRANSMISSION LINES — APPROPRIATE CAPABILITY.

> MCL 460.1153(3)(d) requires a proposed transmission line to be of appropriate capability to enable the wind potential of a wind energy resource zone to be realized; a capability that cannot accommodate the maximum estimated wind potential arguably fails to meet this standard.

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Richard A. Bandstra*, Chief Legal Counsel, and *Kristin M. Smith, Robert W. Beach, Brian W. Farkas, Steven D. Hughey*, and *Patricia S. Barone*, Assistant Attorneys General, for the Public Service Commission.

*Dickinson Wright PLLC* (by *Peter H. Ellsworth, Jeffery V. Stuckey*, and *Michael J. Pattwell*) and *Jim B. Weeks* for the Michigan Public Power Agency and the Michigan Municipal Electric Association.

*Dykema Gossett PLLC* (by *Albert Ernst, Gary P. Gordon*, and *Shaun M. Johnson*) for International Transmission Co.

*Clark Hill PLC* (by *Robert A. W. Strong*) for the Association of Businesses Advocating Tariff Equity.

Before: FITZGERALD, P.J., and METER and BOONSTRA, JJ.

PER CURIAM. In these consolidated cases, appellant Association of Businesses Advocating Tariff Equity (ABATE) (Docket No. 303009) and appellants Michigan Public Power Agency (MPPA) and Michigan Municipal Electric Association (MMEA) (Docket No. 303040) appeal the February 25, 2011, order entered by the Michigan Public Service Commission (PSC) granting appellee International Transmission Company (ITC) an expedited siting certificate for a wind energy transmis-

sion line and authorizing construction of that line on ITC's proposed route.[1] We hold that the PSC properly issued the siting certificate but that its conclusion that construction is permitted by the certificate was erroneous. However, because we are mindful of the effects of our holding, we conclude that limiting it to prospective application is appropriate.

### I. BACKGROUND

Before 2008, all location and construction of electric transmission lines of a certain size and length was governed by 1995 PA 30, known as the Electric Transmission Line Certification Act, MCL 460.561 *et seq.* (Act 30).[2] In 2008, the Legislature passed 2008 PA 295, known as the Clean, Renewable, and Efficient Energy Act, MCL 460.1001 *et seq.* (Act 295). Part 4 of Act 295, MCL 460.1141 *et seq.*, titled "WIND ENERGY RESOURCE ZONES" (Act 295(4)), included provisions for the creation of a wind energy resource zone board (WERZ Board) that would issue a report determining the regions in the state with the highest wind energy harvest potential. MCL 460.1143; MCL 460.1145. After receiving that report, the

---

[1] MPPA and MMEA are appellees in Docket No. 303009, but are appellants in Docket No. 303040. Similarly, ABATE is the appellant in Docket No. 303009, but an appellee in Docket No. 303040. However, because these cases are consolidated, these three parties, all of whom were intervenors in the underlying proceedings, only argue appellant positions, despite their status as appellees in the other appeal. For clarity, throughout this opinion, the term "appellants" shall refer to only ABATE, MPPA, and MMEA and the term "appellees" shall refer to only the PSC and ITC.

[2] Specifically, Act 30 required a certificate to be obtained from the PSC before construction was begun on a transmission line "of 5 miles or more in length wholly or partially owned by an electric utility, affiliated transmission company, or independent transmission company through which electricity is transferred at system bulk supply voltage of 345 kilovolts or more," MCL 460.562(g). See MCL 460.565.

electric utilities, affiliated transmission companies, and independent transmission companies with facilities within or adjacent to the regions identified by the state would "identify existing or new transmission infrastructure necessary to deliver maximum and minimum wind energy production potential for each of those regions" and submit that information to the WERZ Board for review. MCL 460.1145(6). On the basis of the WERZ Board's report, the PSC would then designate an area or region of the state that would likely produce the most wind energy as "the primary wind energy resource zone." MCL 460.1147(1). Act 295(4) also allowed electric utilities, affiliated transmission companies, and independent transmission companies to apply for and obtain an "expedited siting certificate." MCL 460.1149, 460.1151, and 460.1153.

The WERZ Board was created on December 4, 2008. In its final report, dated October 15, 2009, the WERZ Board identified four regions in Michigan with the highest wind energy potential. Relevant to this case, Region No. 4, covering Huron, Bay, Saginaw, Sanilac, and Tuscola Counties, had a minimum wind energy generating capacity of 2,367 megawatts (MW) and a maximum of 4,236 MW. Pursuant to MCL 460.1145(6), on November 30, 2009, ITC informed the WERZ Board that

> [s]ignificant backbone transmission system enhancements would be required in [Region 4] due to the fact that the capacity of the transmission facilities in this region is already lower than the Board identified minimum and maximum wind generation capacity levels. Options presented include six 230 kV [kilovolt] high-temperature circuits at an approximate cost of $560 million to support the minimum wind generation capacity level, and eight 230 kV high-temperature circuits or four 345 kV circuits to support the maximum wind generation capacity level at ap-

proximate costs of $740 million and $510 million respectively. [ITC Michigan Wind Zones Transmission Analysis, November 30, 2009, p 30.]

On January 27, 2010, pursuant to MCL 460.1147(1), the PSC formally accepted the WERZ Board's report and designated Region 4 as the primary wind energy resource zone.

## II. UNDERLYING FACTS AND PROCEEDINGS

Pursuant to MCL 460.1149(4), on February 3, 2010, ITC submitted a letter to the PSC notifying it that, within 60 days or as soon as practicable thereafter, ITC intended to seek approval from the Midwest Independent Transmission System Operator, Inc. (MISO) for a transmission line that would enable realization of the wind power in Region 4. The PSC acknowledged receiving the letter and informed ITC that the letter fulfilled the notice requirements of MCL 460.1149(4). MISO ultimately approved ITC's proposed transmission line in August 2010.

On August 30, 2010, ITC filed an application in the PSC requesting an expedited siting certificate authorizing the construction of a transmission line to enable the wind potential of Region 4 to be realized. The proposed transmission line included "a new 345 kV double circuit tower line and four new substations." Along with the application, ITC filed direct testimony and exhibits addressing specific factors required by MCL 460.1151. The referee granted the petitions to intervene of Consumers Energy, Detroit Edison, MMEA, and MPPA, and ABATE was allowed "permissive" intervention by the PSC.

During the proceedings, appellants argued that ITC's proposed transmission line did not meet the requirements of Act 295(4) because (1) it was oversized, was

too costly, and represented an unreasonable threat to the public convenience; (2) Act 295(4) did not provide authorization for construction of a transmission line because that authorization was reserved to Act 30; (3) ITC was still required to undergo the siting process of Act 30; and (4) Act 295(4) was unconstitutional and void because it displaced the siting process of Act 30. However, on February 25, 2011, the PSC issued an order granting ITC's application for an expedited siting certificate and authorizing it to construct the transmission line using the proposed route.[3]

The PSC determined that "ITC's proofs fulfill[ed] all of the statutory requirements" under MCL 460.1153 and concluded that the transmission line was of "appropriate capability" because it met or exceeded the maximum load, noting that the 10 percent requirement for production of electricity with renewable energy was "a floor, not a ceiling." It also concluded that the size of the proposed transmission line was reasonable "in light of the risk that underbuilding the line now could result in substantially higher costs and additional environmental impacts in the future if transmission capacity needed to be added." Finally, regarding authorization for construction, the PSC concluded that resolving the alleged conflict between Act 295(4) and Act 30 "belongs to the [PSC's] judicial superiors," but stated that it was "counterintuitive" that the Legislature intended an *expedited* siting certificate to take 18 months[4] (emphasis added).

---

[3] There is neither a proposal for decision nor any exceptions because the PSC agreed to read the record.

[4] The 18-month period referred to consists of the provision in Act 295 for "a maximum of 180 days to grant or deny an expedited siting certificate under this section," MCL 460.1153(6), and the provision in Act 30 that the PSC "shall grant or deny the application for a certificate not later than 1 year after the application's filing date," MCL 460.568(4).

In March 2011, appellants filed their appeals in this Court; the appeals were administratively consolidated. *In re Application of Int'l Transmission Co for Expedited Siting Certificate*, unpublished order of the Court of Appeals, entered March 31, 2011 (Docket Nos. 303009 and 303040). The PSC denied appellants' motion for a stay pending resolution of this appeal.

### III. STANDARD OF REVIEW

The standard of review for PSC orders is narrow and well defined. All regulations, practices, and services prescribed by the PSC are presumed, prima facie, to be lawful and reasonable. MCL 462.25; *Great Wolf Lodge of Traverse City, LLC v Pub Serv Comm*, 489 Mich 27, 37-38; 799 NW2d 155 (2011). A party aggrieved by a PSC order bears the burden of proving by clear and convincing evidence that the order is unlawful or unreasonable. MCL 462.26(8).

> To declare an order of the [PSC] unlawful there must be a showing that the [PSC] failed to follow some mandatory provision of the statute or was guilty of an abuse of discretion in the exercise of its judgment. The hurdle of unreasonableness is equally high. Within the confines of its jurisdiction, there is a broad range or "zone" of reasonableness within which the PSC may operate. [*In re MCI Telecom Complaint*, 460 Mich 396, 427; 596 NW2d 164 (1999) (quotation marks and citation omitted).]

An order is also unreasonable if it is totally unsupported by admissible and admitted evidence. *Associated Truck Lines, Inc v Pub Serv Comm*, 377 Mich 259, 279; 140 NW2d 515 (1966).

A reviewing court gives due deference to the PSC's administrative expertise and may not substitute its judgment for that of the PSC. *Attorney General v Pub Serv Comm No 2*, 237 Mich App 82, 88; 602 NW2d 225

(1999). This Court gives respectful consideration to the PSC's construction of a statute that the PSC is empowered to execute and will not overrule that construction absent cogent reasons. *In re Complaint of Rovas Against SBC Mich*, 482 Mich 90, 103; 754 NW2d 259 (2008). If the language of a statute is vague or obscure, the PSC's construction serves as an aid to determining the legislative intent. *Id.* However, the PSC's interpretation is not binding on this Court and "cannot conflict with the Legislature's intent as expressed in the language of the statute at issue." *Id.*

Whether the PSC exceeded the scope of its authority is a question of law that is reviewed de novo. *In re Complaint of Pelland Against Ameritech Mich*, 254 Mich App 675, 682; 658 NW2d 849 (2003).

IV. CONSTITUTIONALITY OF ACT 295(4)

At issue in this case is the proper interpretation of Act 295(4) and Act 30. The primary goal of statutory interpretation is to determine the intent of the Legislature. *Joseph v Auto Club Ins Ass'n*, 491 Mich 200, 205; 815 NW2d 412 (2012). The best indicator of that intent is the language of the statute itself. *Id.* at 205-206. The words used by the Legislature and any undefined terms are given their common and ordinary meaning. See *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 720; 691 NW2d 1 (2005). This Court presumes that the Legislature intended the meaning clearly expressed in unambiguous statutory language and no further construction is required or allowed. *Id.*

In addition, "[s]tatutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v Gate Pharm*, 468 Mich 1, 6; 658 NW2d 127 (2003). Consistently with this mandate, " 'apparently

conflicting statutes should be construed, if possible, to give each full force and effect.' " *In re Midland Publishing Co, Inc*, 420 Mich 148, 163; 362 NW2d 580 (1984), quoting *State Hwy Comm'r v Detroit City Controller*, 331 Mich 337, 358; 49 NW2d 318 (1951).

Appellants first contend that the PSC exceeded its authority by authorizing construction of ITC's transmission line because the expedited siting certificate authorized by Act 295(4) does not authorize actual construction of a transmission line. In addition, having interpreted Act 295(4) to authorize construction, the PSC rendered Act 295(4) unconstitutional because that interpretation created an exception to the requirements of Act 30, thereby violating Const 1963, art 4, § 25, which provides, "No law shall be revised, altered or amended by reference to its title only. The section or sections of the act altered or amended shall be reenacted and published at length." There is no question that Act 30 was not reenacted and published at length when Act 295 was passed. Therefore, to determine whether Act 295(4) violates the Constitution, we must decide whether Act 295(4) seeks to revise, alter, or amend Act 30.

### A. AUTHORIZATION OF CONSTRUCTION

Under Act 30, "[i]f . . . an independent transmission company plans to construct a major transmission line in this state in the 5 years after planning commences, the . . . independent transmission company *shall* submit a construction plan to the [PSC]." MCL 460.564(1) (emphasis added). There is no dispute that the transmission line for which ITC sought approval was a major transmission line as defined in Act 30. See MCL 460.562(g). MCL 460.565 then provides that "[a]n . . . independent transmission company *shall not begin construction* of a major transmission line for which a plan

has been submitted under [MCL 460.564] until the [PSC] issues a certificate for that transmission line." Both of these provisions use the term "shall," making them mandatory. *Mich Ed Ass'n v Secretary of State* (*On Rehearing*), 489 Mich 194, 218; 801 NW2d 35 (2011). Thus, under Act 30, before beginning construction, ITC was required to submit an application for a certificate of public convenience and necessity.

Appellees argue that ITC was not required to submit an application under Act 30 because the siting certificate under Act 295(4) authorized construction. The parties agree that none of the provisions in Act 295(4) expressly states that construction is authorized by issuance of a siting certificate. The PSC argues that the Legislature's use of the term "siting" to describe the certificate that is granted indicates an intent to authorize construction. Specifically, "site" means "to place in or provide with a site; locate" or "to put in position for operation[.]" *Random House Webster's College Dictionary* (1997). Similarly, "construction" is defined under Act 295(4) as "any substantial action *constituting placement* or erection of the foundations or structures supporting a transmission line." MCL 460.1141(a) (emphasis added). Furthermore, certificates issued under Act 30 are not "siting" certificates but certificates of public convenience and necessity for proposed major transmission lines, MCL 460.562(b), and under Act 295(4), a siting certificate "is conclusive and binding as to the public convenience and necessity for that transmission line . . . ." MCL 460.1153(5). Therefore, interpreting a siting certificate to be a construction certificate would explain why there are separate construction provisions in Act 30 that are not present in Act 295(4) and why each act uses a different type of certificate.

Furthermore, given that "siting" means placement and that "construction" is statutorily defined as "any substantial action constituting placement," construction could be interpreted as a subset of siting. This reading would satisfy the principle of statutory interpretation suggesting that construction and siting have different meanings. See *United States Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n*, 484 Mich 1, 14; 795 NW2d 101 (2009) ("If the Legislature had intended the same meaning . . . it would have used the same word."). Accepting that interpretation, the application process itself is arguably "a substantial action constituting placement" and, therefore, constitutes construction. If that is true, then Act 295(4) necessarily authorizes construction because the very act of applying constitutes construction.

Finally, authorization of construction appears implicit from MCL 460.1157, which provides, "This part does not prohibit an . . . independent transmission company from constructing a transmission line without obtaining an expedited siting certificate." It would be legitimate to interpret the express statement that Act 295(4) does not prohibit construction of transmission lines without obtaining an expedited siting certificate to mean that construction is permitted with an expedited siting certificate. Under that reading, interpreting Act 295(4) not to permit construction would render MCL 460.1157 mere surplusage in violation of the rules of statutory interpretation. See *Herald Co, Inc v Eastern Mich Univ Bd of Regents*, 475 Mich 463, 470; 719 NW2d 19 (2006) (holding that courts must "interpret every word, phrase, and clause in a statute to avoid rendering any portion of the statute nugatory or surplusage").

Accordingly, we hold that the PSC's interpretation of Act 295(4) to mean that issuance of an expedited siting

certificate authorizes construction of the transmission line was reasonable. However, this interpretation creates an exception to the mandatory nature of Act 30.

### 1. SUPREMACY CLAUSE

Appellees argue that Act 295(4) has a supremacy clause that trumps the mandatory nature of Act 30. We disagree. Act 295(4) provides, in relevant part: "If the [PSC] grants an expedited siting certificate for a transmission line under this part, the certificate takes precedence over a conflicting local ordinance, law, rule, regulation, policy, or practice that prohibits or regulates the location or construction of the transmission line." MCL 460.1153(4).

"A general rule of statutory construction is that words or phrases shall be read in context and construed according to the rule of grammar and common usage." *Deur v Newaygo Sheriff*, 420 Mich 440, 445; 362 NW2d 698 (1984) (quotation marks and citation omitted). In MCL 460.1153(4), the context indicates that the term "local" modifies each noun in the phrase. See *Hanselman v Wayne Co Concealed Weapon Licensing Bd*, 419 Mich 168, 180; 351 NW2d 544 (1984) (concluding that an introductory adjective "modifies each and every one of the subsequent units or persons and does not merely modify the word" directly following the adjective). This interpretation is also consistent with Act 30, which not only contains identical language in MCL 460.570 but also provides, "This act shall control in any conflict between this act and any other law of this state." MCL 460.563(2). If the language of MCL 460.1153(3) in Act 295(4) were actually a supremacy clause, MCL 460.563(2) would have been unnecessary in Act 30 because MCL 460.570 would have already covered that issue. Thus, MCL 460.1153(3) is

not a supremacy clause that trumps Act 30. Rather, it is Act 30 that "controls" any conflict.

## 2. THE MORE-SPECIFIC, LATER-ENACTED STATUTE RULE

Appellees also assert that Act 295(4) controls over Act 30 because it is the more specific and more recently enacted statute. The rule is that "a later-enacted specific statute operates as an exception or a qualification to a more general prior statute covering the same subject matter and . . . if there is an irreconcilable conflict between two statutes, the later-enacted one will control." *In re Midland Publishing Co*, 420 Mich at 163. Although we agree with appellees that Act 295(4) is both more specific and the more recently enacted statute, we hold that the rule is inapplicable in this case because Act 30 explicitly states that it "shall control" in any conflict. MCL 460.563(2). Accordingly, unless and until its supremacy clause is amended, Act 30 controls regardless of whether more specific, later-enacted statutes are passed.

We conclude, then, that because Act 295(4) implicitly permits construction of wind energy transmission lines without undergoing the process in Act 30, Act 295(4) creates an exception to the mandatory nature of Act 30. Therefore, Act 295(4) revises, alters, or amends Act 30 in violation of Const 1963, art 4, § 25.

### B. EXCEPTION TO REENACTMENT AND PUBLICATION REQUIREMENTS

The parties agree that amendment by implication is an exception to Const 1963, art 4, § 25. See *Alan v Wayne Co*, 388 Mich 210; 200 NW2d 628 (1972); *Nalbandian v Progressive Mich Ins Co*, 267 Mich App 7; 703 NW2d 474 (2005). The exception was first recognized in *People v Mahaney*, 13 Mich 481, 496 (1865). *Alan*, 388

Mich at 270; *Nalbandian*, 267 Mich App at 12. The *Mahaney* Court determined that the act it was considering "does not assume in terms, to revise, alter or amend any prior act, or section of an act, but by various transfers of duties it has an amendatory effect by implication . . . ." *Mahaney*, 13 Mich at 496; see also *Alan*, 388 Mich at 276-277. It continued:

> An amendatory act which purported only to insert certain words, or to substitute one phrase for another in an act or section which was only referred to but not republished, was well calculated to mislead the careless as to its effect, and was, perhaps, sometimes drawn in that form for that express purpose. Endless confusion was thus introduced into the law, and the constitution wisely prohibited such legislation. But an act complete in itself is not within the mischief designed to be remedied by this provision, and cannot be held to be prohibited by it without violating its plain intent. [*Mahaney*, 13 Mich at 497.]

Thus, an act complete in itself will not be found to violate Const 1963, art 4, § 25. See also *Alan*, 388 Mich at 277; *Nalbandian*, 267 Mich App at 14-15.

The *Alan* Court then adopted Justice POTTER's dissent in *People v Stimer*, 248 Mich 272, 293; 226 NW 899 (1929), for the manner in which the determination of whether an act was complete in itself would be made:

> The character of an act, whether amendatory or complete in itself, is to be determined not by its title, alone, nor by the question whether it professes to be an amendment of existing laws, but by comparison of its provisions with prior laws left in force, and if it is complete on the subject with which it deals it will not be subject to the constitutional objection, but if it attempts to amend the old law by intermingling new and different provisions with the old ones or by adding new provisions, the law on that subject must be regarded as amendatory of the old law and the law amended must be inserted at length in the new act. [*Alan*, 388 Mich at 278-279 (quotation marks and citations omitted; emphasis deleted).]

Thus, "[i]f a bill under consideration is intended whether directly or indirectly to *revise, alter, or amend* the operation of previous statutes, then the constitution, unless and until appropriately amended, requires that the Legislature do in fact what it intends to do by operation." *Id.* at 285. However,

> [w]hat we say in no way affects those limited kinds of cases where because of a special fact situation a court is faced with two accidently absolutely conflicting statutes requiring a determination that one or the other applies (and thus an amendment or repeal of the other by implication follows in the fact circumstances). These kinds of cases do not result from any deliberate misleading by the Legislature or failure to make all reasonable efforts to make clear in the statutes what is intended, but rather . . . "[i]t is probable that if the requirement has at any time been disregarded by the legislature, the default has proceeded from inadvertence merely." [*Id.* at 285-286, quoting *Mok v Detroit Bldg & Savings Ass'n*, 30 Mich 511, 517 (1875).]

Accordingly, even though Act 295(4) violates the reenactment and publication requirements of Const 1963, art 4, § 25, the act is not unconstitutional if the conflict is accidental or the act meets the requirements of being an act complete in itself.

### 1. ACCIDENTAL OR INADVERTENT

From an examination of Act 295(4), it does not appear that the conflict between Act 30 and Act 295(4) was accidental or inadvertent. Rather, Act 295(4) "quite clearly resulted from a legislative knowledge of Act 30 and an intent to abrogate that rule with respect to" specific wind energy transmission lines. *Nalbandian*, 267 Mich App at 14. Indeed, the definitions applicable to Act 295 include explicit references to and adopt definitions from Act 30. See MCL 460.1003(d); MCL 460.1007(c). The conflict between Act 295(4) and Act 30

was not the result of " 'inadvertence merely,' " but a "failure to make all reasonable efforts to make clear in the statutes what [was] intended . . . ." *Alan*, 388 Mich at 286 (citation omitted). Because the Legislature intended to amend Act 30, it was required to comply with the "plain and unequivocal requirements of . . . Const 1963, art 4, § 25." *Id.* at 275.

Appellees' reliance on *Alan*, 388 Mich at 282, to argue that reenactment and publication was unnecessary because it would have been absurd and unduly burdensome is similarly unavailing. Appellees rely on the following quote from *Alan*:

> " 'If, whenever a new statute is passed, it is necessary that all prior statutes, modified by it by implication should be re-enacted and published at length as modified, then a large portion of the whole code of laws of the State would require to be re-published at every session, and parts of it several times over, until, from mere immensity of material, it would be impossible to tell what the law was.' " *Stimer*, [248 Mich at] 279, quoting *Mahaney*, [13 Mich at] 497. [*Id.*]

However, the very next paragraph in *Alan* refuted this position and, in fact, adopted the position of the dissent in *Stimer*. *Alan*, 388 Mich at 282-283. The Supreme Court then went on to note "further reasons why the objection that it will be hard work to comply with the constitution is not well taken," including technological advances in printing and copying and the Legislature's "own sophisticated bill drafting and research services . . . ." *Id.* at 283-284.

### 2. COMPLETE IN ITSELF

We also hold that Act 295 is not complete in itself. Comparing its provisions with the prior laws left in force, i.e. Act 30, Act 295 is not "complete on the subject with which it deals[.]" *Alan*, 388 Mich at 279 (quotation

marks and citations omitted). Appellees contend that Act 295(4) is complete on the subject with which it deals because it only deals with transmission lines for electricity generated by wind energy conversion. Appellants argue that Act 295(4) deals with transmission lines and, because transmission lines are already addressed under Act 30, Act 295(4) is simply an amendment of Act 30. Both of these arguments miss the mark because they have limited their focus to Act 295(4). The relevant inquiry is whether the act, i.e. Act 295 in its entirety, is complete in itself.

Nevertheless, even if the focus is limited to Act 295(4) and its purpose is defined as appellees argue, the act is still not complete by its own terms because Act 295(4) is optional. Act 295(4) provides that construction of transmission lines is not precluded without an expedited siting certificate. MCL 460.1157. That means there is a mechanism other than Act 295(4) for permitting construction of transmission lines. Indeed, companies can use Act 30 to construct transmission lines, even for those delivering electricity from wind energy conversion. Thus, Act 295(4) does not even comprehensively address that limited subset of transmission lines, let alone all transmission lines. Consequently, Act 295 cannot be an act complete in itself, rendering any provisions that amend Act 30 a violation of Const 1963, art 4, § 25. *Nalbandian*, 267 Mich App at 15-16.[5]

---

[5] Appellees rely on *People v Cavaiani*, 172 Mich App 706; 432 NW2d 409 (1988), *Meridian Charter Twp v East Lansing*, 101 Mich App 805; 300 NW2d 703 (1980), and *Eyde v Lansing Charter Twp*, 79 Mich App 358; 261 NW2d 321 (1977), to support their argument that Act 295 is complete within itself. However, these cases are not binding on this Court, but *Nalbandian* is. MCR 7.215(J)(1). Thus, to the extent that those cases would permit a different conclusion, this Court is bound to follow *Nalbandian*, which implicitly rejected those cases. See *Nalbandian*, 267 Mich App at 11 n 3.

### 3. ABSURD-RESULTS RULE

Appellants suggest that the Legislature intended to require companies proceeding under Act 295(4) to also comply with the provisions of Act 30. However, "the so-called 'absurd-results rule' applies in Michigan." *Detroit Int'l Bridge Co v Commodities Export Co*, 279 Mich App 662, 664; 760 NW2d 565 (2008). "[A] statute should be construed to avoid absurd results that are manifestly inconsistent with the legislative intent . . . ." *Id.* at 674 (quotation marks and citations omitted). Put another way, "a statute need not be applied literally if no reasonable lawmaker could have conceived of the ensuing result." *Id.* at 675. Considering Act 295 in its entirety, we conclude that it was intended to issue certificates to companies that would permit them to begin construction on transmission lines to harness wind energy in an expedited manner, so that companies could meet their renewable energy requirements by the 2015 deadline. See MCL 460.1027.

The interpretation suggested by appellants, that a company must still comply with Act 30 after completing the process under Act 295(4), eliminates any benefit for proceeding under Act 295(4) and results in the "expedited" process taking up to 18 months, while the traditional process takes 12 months at the most. Appellants assert that the process is not necessarily longer because the two processes can be implemented simultaneously, or the Act 30 process could be started first. However, there is no logical reason why a company would ever use Act 295(4) if Act 30 is still required. Act 30 permits construction once a certificate of public convenience and necessity has been obtained, MCL 460.565, but a siting certificate under Act 295 "is conclusive and binding as to the public convenience and necessity for that transmission

line . . . ." MCL 460.1153(5). Thus, having to comply with both Act 295(4) and Act 30 wastes the time and money of both the applicant company and the PSC and provides nothing of value to either the company or the public that cannot be achieved by moving forward solely under Act 30. Rather, the result of each process is a certificate regarding public convenience and necessity, only one of which actually permits construction. Accordingly, even if the process could be structured so that compliance with both acts did not take any longer than simply moving forward under Act 30, Act 295(4) would still be rendered superfluous because no company would ever use it. Therefore, we conclude that the interpretation suggested by appellants constitutes an absurd result that is manifestly inconsistent with the legislative intent. The absurd-results rule, however, cannot render an unconstitutional act constitutional. Rather, it will simply prevent the absurd result.

### C. A HARMONIOUS INTERPRETATION

Thus, although we conclude that the PSC's interpretation of Act 295(4) to permit construction with the issuance of an expedited siting certificate was both reasonable and consistent with the legislative intent, that interpretation creates an exception to the mandatory provisions in Act 30 in violation of Const 1963, art 4, § 25. Furthermore, this Court is obligated, when possible, to construe apparently conflicting statutes in a manner that gives each statute full force and effect, *In re Midland Publishing Co*, 420 Mich at 163, and to do so in a manner that does not render either statute unconstitutional, *Taylor*, 468 Mich at 6.

There is an interpretation of Act 295 and Act 30 that would give each full force and effect without violating the Constitution: A company that obtains a siting

certificate under Act 295 must also obtain a certificate of public convenience and necessity under Act 30 before beginning construction. Even though this interpretation appears contrary to the legislative intent and violates the absurd-results rule, neither of these doctrines can render an unconstitutional provision constitutional. The only way to interpret the statutes harmoniously without rendering Act 295 unconstitutional is to conclude that, regardless of whether a siting certificate is obtained under Act 295, Act 30 mandates compliance with its provisions (relating to public convenience and necessity) before construction can commence. Accordingly, we so hold.

## V. PROSPECTIVE APPLICATION

Having concluded that there is only one interpretation of Act 295(4) that renders it constitutional, we are, nevertheless, mindful of the effect of our decision. There is no question in our minds that the Legislature did not intend this result, but correcting the unintended result rests with the Legislature. Even so, after taking into account all the circumstances confronting this Court, we conclude that our decision should have only prospective application.

"Although the general rule is that judicial decisions are given full retroactive effect, a more flexible approach is warranted where injustice might result from full retroactivity." *Pohutski v City of Allen Park*, 465 Mich 675, 695-696; 641 NW2d 219 (2002) (citations omitted). The threshold question is "whether the decision clearly established a new principle of law." *Id.* at 696. If so, there are three factors to be considered in determining whether a decision should not have retroactive application: "(1) the purpose to be served by the

new rule, (2) the extent of reliance on the old rule, and (3) the effect of retroactivity on the administration of justice." *Id.*

Although this opinion interprets Act 295(4) in the only manner possible without rendering it unconstitutional, because that result is both absurd and clearly contrary to the intent of the Legislature, "our holding is akin to the announcement of a new rule of law," particularly given the erroneous, albeit reasonable, interpretation adopted by the PSC. *Id.* Having passed the threshold question, application of the three-part test is appropriate and leads us to conclude that prospective application is appropriate here.

First, the purpose of the new rule is to correct an error in the interpretation of Act 295(4) in order to prevent it from being rendered unconstitutional. We believe this purpose would best be furthered by applying it only to applications made under Act 295(4) after this opinion's date. See *id.* at 697; *Riley v Northland Geriatric Ctr (After Remand)*, 431 Mich 632, 646; 433 NW2d 787 (1988) (opinion by GRIFFIN, J.).

Second, we take into account that ITC and unknown other companies relied on the reasonable assumption, and the PSC's ruling, that construction was authorized under Act 295(4) without also having to comply with the requirements of Act 30. Indeed, ITC has already invested at least $110 million in constructing this project in accordance with the PSC's order, which is prima facie lawful and reasonable. See MCL 462.25; *Great Wolf Lodge*, 489 Mich at 37-38. Monopoles have been placed, wires strung, and substations built and dedicated. Prospective-only application recognizes that these actions were taken in reliance on that interpretation.

Third, prospective application minimizes the effect of this decision on the administration of justice. Retroactive application could result in additional litigation as the parties attempt to determine whether ITC's completed construction can remain and whether ongoing construction must be stopped. Prospective application eliminates these uncertainties as well as prevents tying up PSC resources on duplicative reconsideration of evidence under Act 30 in cases that have already been thoroughly considered under Act 295(4) and in which construction has already begun. In addition, it provides the Legislature the opportunity to fix the absurd result created by this required interpretation without placing the energy companies at a disadvantage by stopping the ongoing construction of transmission lines that are necessary to help them meet the 2015 deadline for green energy mandates while time and money are spent on duplicative efforts under Act 30.

Accordingly, this decision shall have immediate effect pursuant to MCR 7.215(F)(2) and shall apply only to applications brought under Act 295(4) on or after the date of this opinion.

### VI. APPROPRIATE CAPABILITY

Appellants also assert that the PSC erroneously concluded that the transmission line proposed by ITC was of an "appropriate capability" as required by MCL 460.1153(3)(d), which provides, "The proposed transmission line will be of appropriate capability to enable the wind potential of the wind energy resource zone to be realized." The PSC stated:

> Region 4 wind production capability was estimated on the record at between 2,367 MW and 4,236 MW. 3Tr. 466. The proposed transmission line will have a 5,000 MW capacity. The [PSC] finds that the proposed transmission

line will be of the appropriate capability to enable the wind potential of the wind energy resource zone to be realized. It is axiomatic that a planned transmission line should not be built to a size that may become overloaded. Further, building to a minimum load is wasteful and results in duplicative efforts (and costs) due to piecemeal construction.

It is undisputed that the Thumb Region has the greatest potential for the development of wind farms. There is also no dispute that the current transmission capability in the Thumb Region is not sufficient to move much more electric power to market. There is unrebutted testimony on the record to the effect that the current transmission system is at or near capacity at this time and failure to add additional transmission capacity will frustrate the Legislature's direction for the [PSC] to facilitate the development of wind power in this state.

Contrary to the assertions of ABATE and MPPA and MMEA[,] the requirement in Section 27 of Act 295 [MCL 460.1027] does not require electric providers to generate 10% of the electric requirement by 2015 via renewable energy, but to generate "not less" than 10% of their needs by 2015 through use of renewable resources, such as wind power. Thus, the limitation on renewable energy systems in [MCL 460.1027] is a floor, not a ceiling.

We conclude that the PSC's interpretation is consistent with the language of MCL 460.1153(3)(d). Contrary to appellants' positions, the PSC did not equate "appropriate capability" with maximum. Indeed, because ITC's proposed transmission line has a 5,000 MW capacity, it exceeds the maximum estimate. The PSC also explained that preventing duplicative efforts and costs from piecemeal construction and not building to a size that could become overloaded were considerations for determining what capability was appropriate.

ABATE argues that the PSC erred by declining to determine that appropriate capability means the mini-

mum capacity, not the maximum capacity. However, this contention is at odds with ABATE's own reasoning. If it is erroneous for the PSC to read "maximum" into the statute, then it is equally erroneous for it to read "minimum" into the statute. Furthermore, interpreting the "appropriate capability" to be the minimum wind potential is contrary to MCL 460.1153(3)(d), which requires the line "to enable the wind potential of the wind energy resource zone to be realized." Because the wind potential in Region 4 is a range that goes significantly higher than the minimum, a transmission line built only to handle the minimum wind potential would not enable the wind *potential* to be realized, only some wind *capability*. Notably, the minimum and maximum numbers were simply estimates. Thus, there is at least some possibility that *more* power could be generated. Therefore, the PSC's decision to require the capacity to be greater than the estimated maximum makes sense.

MPPA and MMEA argue that "wind potential" means the amount of wind power reasonably expected to be realized. However, this definition inserts language into the statute that is not there. MCL 460.1153(3)(d) requires an appropriate capacity for "the wind potential [of Region 4] to be realized." MPPA and MMEA attempt to insert a reasonability requirement that does not exist and then attempt to define what would be reasonable. Again, the statute does not authorize a transmission line that will realize some, most, or even a reasonably anticipated amount of wind potential. It says the line must be capable of enabling the realization of *the* wind potential. Any number less than the maximum estimated capacity arguably fails to meet this standard.

Finally, appellants' argument that the capacity is too large because it exceeds the 10 percent renewable energy standard is meritless. Appellants have ignored

the PSC's basis for rejecting that argument—that the 10 percent figure represents a floor, not a ceiling. Indeed, MCL 460.1027(1) explicitly provides that companies meeting or exceeding certain size thresholds "shall achieve a renewable energy capacity portfolio of not less than" the specified amounts. Thus, the fact that ITC's transmission line would exceed the 10 percent requirement is in keeping with the Legislature's mandate of a 10 percent minimum.

Accordingly, appellants have failed to provide a cogent reason to overrule the PSC's construction of "appropriate capability."[6]

### VII. FEASIBLE AND REASONABLE ROUTE

Finally, ABATE argues that the PSC's conclusion that the route was both feasible and reasonable was erroneous because a letter from the Department of Agriculture indicated disagreement with ITC's position that the transmission lines would have no impact on land that was enrolled in the state's farmland preservation program and because they were concerned that property in the transmission line route might "be acquired via some other property interest other than an easement." We decline to consider this issue because it is unpreserved and abandoned.

ABATE not only never argued before the PSC about the specific letter from the Department of Agriculture, but it never argued any grounds to the PSC for concluding that the route was not feasible or reasonable. In addition, there is no evidence that the PSC even con-

---

[6] Because the PSC appropriately interpreted the term, there is no reason to consider whether the evidence supports its decision. Appellants' arguments are premised on the interpretation being erroneous. None of them argued that the PSC's decision was still erroneous even if its interpretation was proper.

sidered the letter on which ABATE rests its argument. The letter was not marked as received by the PSC until February 1, 2011, long after the December 1, 2010, close of the evidentiary record and only 24 days before the PSC issued its order. Finally, ABATE has not cited a single legal authority for its argument. "A party may not simply announce its position and then leave it to this Court to discover and rationalize the basis for its claims. Furthermore, a party may not give an issue cursory treatment with little or no citation of supporting authority." *In re Application of Ind Mich Power Co*, 275 Mich App 369, 376; 738 NW2d 289 (2007) (citations omitted). Accordingly, this issue has been abandoned. *Id.*, citing *Yee v Shiawassee Co Bd of Comm'rs*, 251 Mich App 379, 406; 651 NW2d 756 (2002).

VIII. CONCLUSION

We hold that the PSC properly issued the siting certificate to ITC, but that it erroneously concluded that construction was authorized by the certificate. The only way to interpret Act 295 harmoniously with Act 30 that does not render Act 295 unconstitutional is to conclude that, regardless of whether a siting certificate is obtained under Act 295, Act 30 mandates compliance with its provisions before construction can commence. Nevertheless, after consideration of the effects of this decision, we hold that this decision is limited to prospective application. Therefore, we affirm the result of the PSC's order in this case.

FITZGERALD, P.J., and METER and BOONSTRA, JJ., concurred.