*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

---

LW,

        Petitioner-Appellee,

v

SCM,

        Respondent-Appellant.

UNPUBLISHED
January 19, 2023

No. 359150
St. Clair Circuit Court
LC No. 19-002511-PH

---

LW,

        Petitioner-Appellee,

v

KJL,

        Respondent-Appellant.

No. 359153
St. Clair Circuit Court
LC No. 19-002521-PH

---

Before: M. J. KELLY, P.J., and BOONSTRA and SWARTZLE, JJ.

PER CURIAM.

Petitioner sought a personal protection order (PPO) against three individuals whom he alleged were acting in concert to harass and intimidate him. Specifically, he alleged that respondent, SCM, and another individual, JF, posed as process servers in order to obtain video footage of his residence, which they then gave to respondent KJL, who posted it on Facebook in order to incite others to commit violence against him. Following an evidentiary hearing, the trial court granted petitioner a PPO against SCM and KJL.[1] In these consolidated appeals, they jointly

---

[1] The trial court did not grant petitioner's request for a PPO against JF.

appeal that decision as of right. Because the trial court did not abuse its discretion in granting petitioner a PPO against SCM and KJL, we affirm the court's decision in both cases.

## I. BASIC FACTS

On October 28, 2019, petitioner filed a petition seeking entry of a PPO against SCM, KJL, and JF. Initially, the court granted the petition and entered PPOs against the respondents; however, the court subsequently rescinded its order because petitioner had failed to serve notice to respondents. Thereafter, the court held an evidentiary hearing to determine whether or not to grant the petition for a PPO. The hearing was held over two days. KJL, who was representing himself, appeared via Zoom technology at the first hearing. However, between the first hearing and the second, several warrants for KJL's arrest were issued. The court explained that it had a policy that prohibited virtual appearances by individuals with outstanding warrants. As a result, the court prohibited him from appearing via Zoom. The court offered KJL the opportunity to appear in person or to surrender to law enforcement and appear virtually. KJL did not avail himself of that opportunity. Consequently, in addition to prohibiting the appearance via Zoom, the trial court entered a default against KJL.

At the evidentiary hearing, petitioner, who was representing himself pro se, testified that SCM and JF had visited his property four times as process servers for KJL. He explained that they had filmed him and his residence each time, and that KJL posted the videos on Facebook to encourage others to harass him. He gave them permission to record the first time because they were "court" process servers. On a later occasion, he asked them the purpose of recording his residence; FJ told him that the purpose was to show that the subpoena was actually served upon petitioner. On the final occasion, he prohibited them from recording, but they did so anyway.

Petitioner testified that shortly after each visit, the video footage that they recorded was posted online by KJL. In support, he submitted screenshots that he testified had been taken from video footage posted on Facebook by KJL. One screenshot appears to depict a person on the roof of a shack. Petitioner testified that he was the person in the screenshot and that the only time that he was on the roof of the shack was on the last day that FJ and SCM had come to serve him with a subpoena. In a written post accompanying the video, KJL appears to have written "[Petitioner]'s new shack has been located and documented on [RM]'s property." He included a screenshot of the sex offender registry depicting petitioner, and in response to comments, he clarified that petitioner had built a "new" shack "in the woods." He added that the new shack was "newer and nicer . . . complete with a bay window, storm door, and wood stove" and that petitioner "also has a motion detector on a pole and an elevated gun blind." In a comment, someone asked if a picture of the new shack could be obtained; KJL responded "[t]here is video."

Petitioner testified that after the video was posted, he heard gunshots in the area around him. He described the gunshots as being from multiple individuals who seemed to have circled his location. He described the gunshots as sequential, with one person firing after another and with each person firing approximately eight times. He stressed that he was familiar with gunshots during deer hunting season and that this gunfire was different. He testified that he was afraid because of the actions of KJL, SCM, and FJ. He added that he believed that the three men were working together to harass him. He also stated that the first time that SCM served process, SCM asked him who KJL was despite the fact that SCM was KJL's stepfather.

Following evidentiary hearings, the trial court granted petitioner's requests for PPOs against KJL and SCM. The trial court concluded that the process-serving activity was pretext to gain information about petitioner, which SCM provided to KJL so that KJL could post the information online in an effort to encourage others to harass petitioner. The trial court determined that KJL and SCM had engaged in stalking, in violation of MCL 750.411h, and electronic stalking, in violation of MCL 750.411s, each of which may serve as the basis upon which to issue a PPO under MCL 600.2950a(1). This appeal follows.

## II. ENTRY OF DEFAULT AGAINST KJL

### A. STANDARD OF REVIEW

KJL argues that the trial court abused its discretion by entering a default PPO against him.[2] This Court reviews for an abuse of discretion a trial court's decision to default a party. *Barclay v Crown Bldg & Dev, Inc*, 241 Mich App 639, 651; 617 NW2d 373 (2000). A trial court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes. *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006).

### B. ANALYSIS

KJL first argues that the trial court was required to allow him to appear via Zoom because at the time of the second evidentiary hearing virtual appearances were both permitted and required by the Michigan Supreme Court. In support, he directs this Court to Administrative Order No. 2020-6, 505 Mich xc (2020). While in effect, the order required "all judges in Michigan . . . to make a good faith effort to conduct proceedings remotely whenever possible." *Id*. at xcii. Contrary to KJL's argument on appeal, the plain language of the Administrative Order did not mandate that the trial court permit a virtual appearance. Rather, the court was only required to make a good-faith effort to conduct proceedings remotely "whenever possible." The order, therefore, left the court with discretion to conduct proceedings remotely. Here, the trial court had a policy that it would not allow virtual appearances for people with outstanding warrants. Thus, under the court's policy, because KJL had multiple outstanding warrants, it was not possible for

---

[2] In his brief on appeal, KJL assumes that a default is an available remedy in the PPO context. He also suggests, however, that it is "not clear" that it is an available remedy, but he offers no analysis in support of that assertion. "It is not enough for an appellant in his brief simply to announce a position or assert an error and then leave it up to this Court to discover and rationalize the basis for his claims, or unravel and elaborate for him his arguments, and then search for authority either to sustain or reject his position." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Accordingly, to the extent that KJL is arguing that a default is not an available remedy in the PPO context, that argument is abandoned by his failure to adequately brief the issue. Thus, for purposes of this opinion, we assume arguendo that a trial court may enter a default against a respondent in a PPO proceeding.

him to appear remotely. We conclude that under the present circumstances, the trial court's decision to deny the remote appearance was not in violation of AO 2020-6.

The trial court stated that its default entered against KJL was "due to his failure to defend." MCR 2.603(A) authorizes the court to enter the default of a defendant who fails to "plead or otherwise defend" in an action. *Kowalski v Fiutowski*, 247 Mich App 156, 163; 635 NW2d 502 (2001). A default prevents a party from defending against well-pleaded allegations. *Kalamazoo Oil Co v Boerman*, 242 Mich App 75, 79; 618 NW2d 66 (2000). Michigan courts generally favor the determinations of issues on their merits. *Id*. at 86. "Default is a drastic measure and should be used with caution." *Traxler v Ford Motor Co*, 227 Mich App 276, 286; 576 NW2d 398 (1998).

On appeal, KJL next argues that the entry of a default was improper because the trial court did not evaluate other available options. In support, he directs this Court to *Vicencio v Ramirez*, 211 Mich App 501, 506; 536 NW2d 280 (1995), which provides that before entering a default as a sanction, "the trial court is required to carefully evaluate all available options on the record and conclude that the sanction is just and proper." The failure to do so can constitute an abuse of discretion. *Id*. at 506-507. The trial court did not enter the default in this case as a sanction, however. Instead, as noted above, it entered it based upon KJL's failure to defend. Moreover, even if it were entered as a sanction, the record reflects that the court considered less drastic options. Specifically, the court advised KJL that he had the option of appearing in person or surrendering to the police on his warrants and appearing virtually from jail. Therefore, the trial court did discuss alternatives to default.

In sum, the trial court did not abuse its discretion by prohibiting KJL from appearing virtually while he had outstanding warrants. Further, because the default was not entered as a sanction and was instead entered based upon KJL's failure to defend, the court was not required to discuss alternative, less drastic sanctions on the record before entering the default.

III.  NON-DOMESTIC PPO

A.  STANDARD OF REVIEW

SCM argues that the trial court abused its discretion by granting petitioner's request for a PPO against him. This Court reviews for an abuse of discretion a trial court's decision regarding whether to issue a PPO. *TT v KL*, 334 Mich App 413, 438; 965 NW2d 101 (2020). The court's findings of fact are reviewed for clear error. *Id*.

B.  ANALYSIS

The purpose of PPOs is to protect individuals "who are maliciously followed, harassed, or intimidated by stalkers." *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 721; 691 NW2d 1 (2005). A petition for a PPO is governed by the court rules except as otherwise provided in MCL 600.2950 and MCL 600.2950a. *TT*, 334 Mich App at 439. MCL 600.2950a is the nondomestic PPO statute, which "addresses stalking behavior or conduct that is not limited to certain existing relationships." *Id*. MCL 600.2950a(1) provides as follows:

Except as provided in subsections (27), (28), and (30), by commencing an independent action to obtain relief under this section, by joining a claim to an action, or by filing a motion in an action in which the petitioner and the individual to be restrained or enjoined are parties, an individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under section 411h, 411i, or 411s of the Michigan penal code. A court shall not grant relief under this subsection unless the petition alleges facts that constitute stalking as defined in section 411h or 411i, or conduct that is prohibited under section 411s, of the Michigan penal code. Relief may be sought and granted under this subsection whether or not the individual to be restrained or enjoined has been charged or convicted under section 411h, 411i, or 411s of the Michigan penal code for the alleged violation. [Citations omitted.]

MCL 750.411h concerns stalking, MCL 750.411i pertains to aggravated stalking, and MCL 750.411s covers online stalking.

In this case, the trial court determined that SCM's behavior of filming petitioner's residence and curtilage while serving a subpoena, and providing the video to KJL, violated both the stalking and online-stalking statutes. According to MCL 750.411h(1)(d), "stalking" is "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested." MCL 750.411h(1)(c) defines "harassment," in relevant part, as "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." MCL 750.411h(1)(e) defines "unconsented contact" as "any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued."

On appeal, SCM argues that the petition failed to allege that he engaged in two or more separate noncontinuous acts. The intentional "course of conduct" required for stalking by MCL 750.411h(1)(d) "means a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose." MCL 750.411h(1)(a). SCM's argument is without merit. The petition against SCM alleges that (1) SCM, while acting on behalf of his stepson KJL, delivered multiple subpoenas to petitioner, (2) that each time he was posing as a process server SCM video recorded details of petitioner's current and prior residence, and (3) he provided the video footage to KJL to post online so that petitioner would be harassed and intimidated. During the hearing that followed, petitioner testified that there were four instances of such conduct on SCM's part. Petitioner thus alleged an intentional course of conduct consisting of four separate noncontinuous events.

SCM next contends that the trial court improperly shifted the burden to SCM to disprove petitioner's allegations that SCM was acting in concert with KJL to publish details of petitioner's residence online in order to incite harassment against petitioner. The individual petitioning the trial court for a PPO bears the burden of proof. *TT*, 334 Mich App at 439. In support of this claim, SCM cites the following part of the trial court's opinion:

Petitioner testified that he believed the service of process was pretextual, that [SCM] and [JF] were on [the subject] property simply to get information about his new residence to provide it to [KJL]. In support of his assertion, petitioner points to a number of different facts. Petitioner was never actually called to testify by [KJL] at any of the hearings to which he was subpoenaed. No copies of the subpoenas served on petitioner or a proof of service showing the circumstances of service were admitted into evidence. [SCM] and [JF] both testified they did not know what they had served on petitioner. They did not keep copies of the documents they served, their proofs of service, or of the videos [SCM] took. Absent any evidence to the contrary, the record supports petitioner's assertion.

SCM argues that the trial court's statement, "Absent any evidence to the contrary," implied that SCM had the burden to disprove the allegations in the petition. Viewed in context, however, it is clear that the court's statement was only an indication that the evidence presented by petitioner in support of his claim was unrebutted. The court did not improperly shift the burden.

Next, SCM argues that the trial court erred by concluding that he violated the stalking statute, MCL 750.411h(1)(d) because harassment does not include "conduct that serves a legitimate purpose." MCL 750.411h(1)(c). Conduct that serves a legitimate purpose is "conduct that contributes to a valid purpose that would otherwise be within the law irrespective of the criminal stalking statute." *Nastal*, 471 Mich at 723. In support, SCM directs this Court to his testimony that he had served legal documents 15 to 30 times, half of which were for KJL; that he had served petitioner with four subpoenas; and that it was his custom to video-record the service of documents to prevent allegations of failed service. FJ's testimony corroborated his statements. Thus, there was clearly evidence that would support a finding that he was engaged in conduct that serves a legitimate purpose.

Yet, the court found that "the conduct which serves as the basis for issuance of the PPO is not the service of whatever documents were served, it is the other actions taken by [SCM] while doing so." At respondents' request, the trial court took judicial notice of earlier proceedings involving KJL and petitioner. In earlier proceedings, SCM testified as a witness on behalf of KJL. Thus, he was aware that the court had issued a PPO against KJL in August 2018 because KJL was harassing petitioner and the owners of the property where petitioner resided. In that case, the court found that KJL had engaged in stalking by trespassing on the property, posting disparaging messages about petitioner on social media, and permitting comments threatening to petitioner on the posts, with the "obvious intent" that the messages would "cause conduct that would make petitioner feel threatened or intimidated." When petitioner alleged that KJL violated the earlier PPO, SCM appeared as a witness on behalf of KJL. The court did not find credible SCM's testimony that petitioner, rather than KJL, was the aggressor who initiated the contact that resulted in a finding that KJL violated the earlier PPO. The trial court also relied upon testimony in a prior proceeding showing that SCM had aided KJL in posting material online that was related to the earlier PPO proceedings. Moreover, as noted above, SCM was KJL's stepfather.

In weighing whether to issue a PPO, a trial court should "take into consideration the totality of the circumstances." *Patterson v Beverwyk*, 320 Mich App 670; 922 NW2d 904, 913 (2017). The "pattern of conduct between and involving the parties . . . had to be examined in its entirety,"

because past events, including those from a previous petition, "could give explanation or context to the [current] incident by providing insight on intent, continuity of purpose, the reasonableness of beliefs, and states of mind or feelings." *PF v JF*, 336 Mich App 118, 128-129; 969 NW2d 805 (2021). In determining whether a PPO is necessary, a trial court may consider the petition along with "testimony, documents, and other evidence proffered." *Lamkin v Engram*, 295 Mich App 701, 711; 815 NW2d 793 (2012). Evidence that KJL had a history of harassing, and inciting threats against, petitioner by posting information about him on the Internet supported the conclusion that the SCM took the videos, and provided them to KJL, for the purpose of harassing petitioner, rather than documenting service of a subpoena.[3]

Moreover, petitioner testified that SCM's service of subpoenas was not a genuine effort to secure his appearance at hearings, given that there was no evidence of proof of service filed with a trial court, and that KJL had him excused from hearings for which he was subpoenaed. Petitioner explained that, when he was served subpoenas in other matters, deputies would serve him at the main house on the property. Petitioner additionally testified that he noticed that KJL posted videos of his property near in time to each of SCM's visits to the property, including details that existed only on the day of service, such as that he was on the roof. One video included details of an area where petitioner relocated his residence, including a hunting tree stand, and an alarm system. Petitioner further testified that SCM had asked him who KJL was, despite SCM's relationship to KJL as his stepfather, and that SCM denied knowing KJL. Petitioner unsuccessfully asked SCM to stop filming after he discovered that SCM was related to KJL.

In sum, SCM's videos captured more than service of process upon petitioner for appearances not actually required of him, and the videos were quickly relayed to KJL who published them online to further a campaign of harassment that had previously resulted in a PPO against KJL. This evidence supported the trial court's conclusion that SCM's service or subpoenas upon petitioner for KJL was pretextual and actually used to gain information about petitioner's residence. Accordingly, the trial court did not abuse its discretion by determining that SCM's visits to petitioner's residence did not constitute "conduct that serves a legitimate purpose."[4]

Finally, SCM argues that the trial court erred by wrongfully denying him the presence of a key witness. In the proceedings below, SCM's lawyer objected to KJL's exclusion from the hearing. He indicated that he had intended to call KJL as a witness. The court offered to issue a subpoena compelling KJL's appearance at the hearing, but the lawyer did not avail himself of that

---

[3] We note that, by itself, there is nothing improper with a process server recording his or her service of documents on an individual. Rather, it is the additional facts and circumstances of this case that allows for an inference that otherwise legitimate conduct can allow for an inference sufficient to warrant the issuance of a PPO.

[4] The trial court also concluded that SCM violated MCL 750.411s by aiding and abetting KJL in the matter, citing MCL 767.39. SCM argues that, for purposes of this civil action, criminal violation of MCL 750.411s by way of aiding and abetting another does not justify a PPO. Because the trial court's finding that SCM violated MCL 750.411h itself justified the PPO against him, see MCL 600.2950a(1), we need not decide whether the court erred by concluding that violation of MCL 750.411s as an aider and abettor also justified the PPO.

opportunity. Instead, he made an offer of proof as to what KJL testimony would have been if he had been permitted to appear via Zoom. Given that the trial court presented him with an opportunity to secure KJL's testimony, we discern no error related to the court's refusal to allow KJL to testify via Zoom.

Affirmed.

/s/ Michael J. Kelly
/s/ Mark T. Boonstra
/s/ Brock A. Swartzle