*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JH,

              Petitioner-Appellee,

v

TI,

              Respondent-Appellant.

UNPUBLISHED
March 13, 2026
1:34 PM

No. 371201
Oakland Circuit Court
LC No. 2024-527062-PH

Before: WALLACE, P.J., and GARRETT and ACKERMAN, JJ.

PER CURIAM.

Respondent appeals as of right a personal protection order (PPO) entered by the trial court after an MCR 3.705(B) hearing on May 15, 2024. Respondent argues, *inter alia*, that the trial court abused its discretion by granting the PPO because the conduct or speech at issue in this matter did not constitute stalking or harassment under the pertinent statutes. While we find that petitioner provided ample evidence for one of the two unconsented contacts required for the issuance of a PPO for stalking, he failed to provide sufficient evidence of a second. As a result, we reverse the trial court, vacate the PPO, and remand with instructions.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

The parties to this lawsuit live in the same neighborhood in Novi. On October 17, 2023, petitioner was walking his dog down the sidewalk on a leash that was tied around his waist. Photographs admitted into evidence at the PPO hearing suggest that petitioner's dog weighs less than 50 pounds and that the leash is approximately 8 to 10 feet in total length.

At the same time, respondent and her son, AI, were respectively riding a bicycle and a kick scooter down the same sidewalk in the opposite direction to a nearby neighborhood park. Respondent testified that AI is 14 years old, has autism, is non-verbal, and that she always accompanies him on daily outdoor activities.

Petitioner testified at the PPO hearing that AI approached them at "a very fast rate of speed," startling both him and his dog, and that his dog jumped up on AI and barked. Petitioner

testified that AI then "just kind of zooms off on a scooter" and respondent "approaches me and starts screaming at me, telling, saying, or alleging that my dog bit her son."

According to respondent, she called out that they were passing petitioner, but he was "on his phone" and did not respond, and his dog was walking behind him on a leash. Respondent testified that, as AI was passing them, petitioner's dog "started to growl, show her teeth, and started to attack my son, grabbed ahold of . . . his right thigh." She then said to petitioner, "get ahold of your dog, your dog is attacking my son" and petitioner looked over and said, "No, she isn't." Petitioner denied that his dog bit AI. Respondent claims that as AI was pushing away on his scooter, "the dog hooks on to his right thigh, ripping his pants." Respondent testified that she was "screaming, why aren't you doing anything? Your dog is attacking my son again," and that he again responded, "No, she isn't." Respondent claims that, after she screamed at petitioner and was riding after her son, petitioner said "Get that kid off of the sidewalk, that kid does not belong on the sidewalk, he's scaring my dog." Respondent testified that once she and AI got down to the park, she called her husband, who directed her to call the police, and that the police in turn directed her to return home where they would send an officer to take a report.

Later that same day, according to petitioner, respondent walked up to less than a foot away from him and her son approached to within two feet from him (while he was still walking his dog on a leash), to show him the small tear in the fabric on the pocket on the side of AI's pant leg. Petitioner again denied that his dog bit AI.

Respondent, in turn, testified that as she and AI were returning home, they again passed petitioner and his dog, who were walking towards them on the sidewalk. Respondent testified that petitioner's dog was lunging and growling at AI, and that she directed him to "pull the leash" of his dog (that was walking behind petitioner on the sidewalk), but that petitioner would not do so. Respondent then stopped her bicycle, said she was going to take a photograph of him "to show the officer exactly what you're doing," and directed him to pull the leash, which he then did. The photograph admitted into evidence at the PPO hearing shows petitioner with one of his feet on the lawn and the other on the sidewalk, holding his dog off the edge of the sidewalk by his leash, with only 2-3 feet separating them from AI, who is on his kick scooter on the sidewalk next to them.

Respondent testified that the officer had her fill out a form from Oakland County Animal Control and provide him with a photograph of "my son's skin and his ripped pants." Petitioner testified that he talked to the police after respondent made her report and agreed to quarantine his dog (which was to last ten days). Petitioner's PPO petition states that, on October 20, 2023, petitioner spoke with an animal control deputy, who stated that, after reviewing the incident, they were dropping the matter as "this is not a bite," "no injury occurred," and the quarantine was immediately dropped.

Respondent testified that petitioner was in his car parked in front of her house the following morning, but then slowly drove away as she was backing out of her driveway. Petitioner denied that he came by respondent's house on October 18, 2023.

Petitioner testified that, after the October 2023 incident, he would see respondent passing by his home, staring him down intensely.

Respondent testified that she and AI pass by petitioner's house practically every day either on their respective bike and scooter, or walking their assistance dog, or both. She testified that AI learns through repetition and has memorized that route, but she acknowledged that her son could memorize another route and thereby avoid passing petitioner's house, but that they have not done so. She testified that on one occasion in January 2024 and another occasion in February 2024, while walking past petitioner's home with AI and their assistance dog, petitioner was backing his car into his carport and that he thereafter got out of his car, stepped out onto his driveway and observed them as they walked past.

The PPO petition asserts that, on April 22, 2024, petitioner was again walking his dog on the sidewalk and saw respondent and her son approaching on their bicycle and scooter. He took his dog into the street to avoid them passing close by on the sidewalk. The petition asserts that, as she passed by, respondent yelled "you should be ashamed, your dog is awful, you have a bad dog, and you are an irresponsible dog owner." For her part, respondent testified that in this first encounter on April 22, 2024, she and AI were passing petitioner and his dog on the sidewalk again and "[t]he dog lunge[d] for my son once again, growling, showing her teeth."

Petitioner then finished his dog walk and was back within sight of his house when he spotted respondent and AI once again approaching him on bicycle and scooter. Petitioner asserts that, because he feared another confrontation, he got his phone out and began to record video.

The video admitted into evidence at the PPO hearing shows that petitioner and his dog were standing at the corner of an intersection, waiting for respondent and AI to pass by as another neighbor was walking up to him and his dog on the sidewalk (from his left). Respondent then said loudly to the approaching neighbor, from the other side of the road: "Watch out for this dog. It's very mean. He is a very mean this dog. He attacked my son." Petitioner then stated: "Ma'am, you need to control your child, your child ran into my dog." AI is seen continuing down the sidewalk on his scooter away from his mother while she and petitioner yell additional remarks and insults at each other, e.g., that petitioner was "talking crazy," and, in response, that respondent "is crazy"; and that petitioner was a "very irresponsible dog-owner," and, in response, that respondent was "a bad mother." Respondent then set her bicycle down, marched into and across the street to approach petitioner, in front of a car driving down the road that stopped to let her pass. She then stood in front of petitioner to point her finger at and berate him (again apparently without any concern about his dog) and then swiped at petitioner's phone (that was raised in his left hand to record her) with her right hand and arm. Respondent testified at the PPO hearing that she struck the phone with her hand, but petitioner testified that she missed the phone and struck him on the left shoulder. Petitioner then declares, "You just hit me!" and the recording stops shortly thereafter.

Respondent testified that she was protecting her son when the foregoing events transpired, but her son rode his scooter down the sidewalk away from her, out of the view of the video, while these events transpired.

Respondent testified that, when she first saw petitioner and his dog at the corner just before their second encounter on April 22, 2024, she had her husband on the cell phone, and that she kept him on speaker phone in the basket of her bike, "in case this man says anything."

The PPO petition asserts that, after respondent struck him, petitioner informed respondent that he was calling the police and that she responded: "My husband will deal with you." Respondent denied making this statement at the PPO hearing. Thereafter, petitioner testified that, while he was on the phone with 911, respondent's husband pulled up in a white van, parked on the wrong side of the street, got out, approached to within about a foot of petitioner (and his dog), and stated, "We'll deal with this, come to my house." At the hearing, respondent denied that her husband made this statement. Petitioner testified that he thought this statement sounded very threatening and menacing and, on the advice of the 911 dispatcher, he did not go to respondent's house—he returned home instead. Petitioner filed a police report and indicated that he wanted to press charges for assault and battery.

Several days after the April 2024 incident, petitioner filed a petition for a PPO against respondent.[1] At the conclusion of the May 15, 2024 PPO hearing, based upon petitioner and respondent's testimony and the video of the April 22, 2024 incident, the trial court found that:

> On or about October 17, 2023, respondent accused petitioner's dog of biting her son's leg while walking in the neighborhood.
>
> It was determined that, on October 20, 2023, by animal control that respondent's son did not receive a dog bite and that the quarantine of petitioner's dog was dropped.
>
> Petitioner testified that he felt threatened by the respondent as a result of this incident.
>
> Subsequently, on April 22, 2024, while walking in their Novi neighborhood, on the same side of the street, petitioner allowed respondent and her son to pass and cross the street.
>
> Subsequently, respondent threw her bike down and ran across the street in front of a moving car and began to berate petitioner verbally and struck his phone, while it was still held in his hand.
>
> The Court also received and viewed a video of the April 22, 2024[] incident, depicting the events which took place.
>
> [Respondent's] husband drove to the scene and invited petitioner to come down to their, the respondent's [residence]. Petitioner did not go to respondent's home but instead reported the matter to the local police.

---

[1] The petition included a request for an ex-parte order, which was denied, but the matter was set for hearing on May 13, 2024. An order of adjournment was then entered adjourning the hearing to May 15, 2024.

Subsequently, respondent was charged in the 52-1 District Court, in Novi, Michigan, [with] a misdemeanor offense.

Petitioner testified that he has felt threatened by respondent's aforesaid actions and fears physical harm from respondent and her husband.

Based on the foregoing, the trial court found that petitioner brought forward facts, which took place on October 17, 2023 and April 22, 2024, that constitute stalking by respondent. It further found that respondent engaged in this course of conduct with intent to cause and has actually caused the petitioner to feel terrorized, frightened, and intimidated by those events, and that petitioner has suffered emotional distress as a result of respondent's conduct.

The trial court entered a PPO consistent with its ruling from the bench on May 15, 2024 with an expiration date of May 15, 2025.[2] The PPO did not bar respondent from appearing within sight of petitioner, but prohibited her from following petitioner, appearing at his workplace or residence, and approaching or confronting the petitioner in a public place or on private property. The PPO included multiple other prohibitions, including barring her from posting a message through the use of any medium of communication, including the Internet or a computer or any electronic medium, pursuant to MCL 750.411s.

## II. STANDARD OF REVIEW

We review a trial court's decision to issue a PPO for an abuse of discretion. *CAJ v KDT*, 339 Mich App 459, 463; 984 NW2d 504 (2021). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Id*. This Court also reviews the trial court's findings of fact for clear error and its questions of statutory interpretation de novo. *Id*. "The clear-error standard requires us to give deference to the lower court and find clear error only if we are nevertheless left with the definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted).

> Findings of fact by the trial court may not be set aside unless clearly erroneous. In the application of this principle, regard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it. [MCR 2.613(C)].

The trier of fact is in the position to consider the demeanor of each witness in weighing the credibility of their respective testimonies. See *SP v BEK*, 339 Mich App 171, 176; 981 NW2d 500 (2021).

---

[2] While the PPO has expired in the course of this appeal, "identifying an improperly issued PPO as rescinded is a live controversy and thus not moot" for appeals purposes upon its expiration. *TM v MZ*, 501 Mich 312, 319; 916 NW2d 473 (2018).

### III. ANALYSIS

The petitioner has the burden of proof to demonstrate reasonable cause for the issuance of a PPO. *Hayford v Hayford*, 279 Mich App 324, 326; 760 NW2d 503 (2008). MCL 600.2950a addresses the issuance of a PPO for stalking behavior in nondomestic relationships, and subchapter 3.700 of the Michigan Court Rules governs procedure in personal protection proceedings. In part pertinent to the present appeal, MCL 600.2950a(1) provides that:

> Except as provided in subsections (27), (28), and (30), by commencing an independent action to obtain relief under this section, by joining a claim to an action, or by filing a motion in an action in which the petitioner and the individual to be restrained or enjoined are parties, an individual may petition the family division of circuit court to enter a personal protection order to restrain or enjoin an individual from engaging in conduct that is prohibited under section 411h, 411i, or 411s of the Michigan penal code, 1931 PA 328, MCL 750.411h, 750.411i, and 750.411s. A court shall not grant relief under this subsection unless the petition alleges facts that constitute stalking as defined in section 411h or 411i, or conduct that is prohibited under section 411s, of the Michigan penal code, 1931 PA 328, MCL 750.411h, 750.411i, and 750.411s.

MCL 750.411h(1) defines "harassment" and "stalking":

> (d) "Harassment" means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose.

> (e) "Stalking" means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

MCL 750.411h(1) defines "course of conduct" and "unconsented contact":

> (a) "Course of conduct" means a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose.

> * * *

> (f) "Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, but is not limited to, any of the following:

> (i) Following or appearing within the sight of that individual.

(ii) Approaching or confronting that individual in a public place or on private property.

(iii) Appearing at that individual's workplace or residence.

(iv) Entering onto or remaining on property owned, leased, or occupied by that individual.

(v) Contacting that individual by telephone.

(vi) Sending mail or electronic communications to that individual.

(vii) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual.

MCL 750.411i sets forth identical definitions of "stalking," "harassment," and "course of conduct."

MCL 750.411s(1) addresses "posting a message through the use of any medium of communication . . . without the victim's consent" (such as via a computer or the internet) "intended to cause conduct that would make the victim feel terrorized, frightened, intimidated, threatened, harassed, or molested."

This Court has previously noted that MCL 750.411h(1)(a), which defines "course of conduct," requires "evidence of two or more acts of unconsented contact that caused the victim to suffer emotional distress and that would cause a reasonable person to suffer emotional distress." *Hayford*, 279 Mich App at 330.

On appeal, respondent argues that the trial court erred by finding that respondent stalked petitioner. We agree. Petitioner relied upon two incidents for issuance of the PPO, the incident that occurred in October 2023 and the other that occurred in April 2024. There was ample evidence introduced in support of the allegation that petitioner felt frightened by the events that occurred in April 2024. But there was no evidence admitted in this case indicating that petitioner felt frightened, intimidated, threatened, harassed, or molested by the incident in October 2023. While the trial court concluded that petitioner "felt threatened by respondent" during the October 2023 incident, nothing in the record supports this conclusion.

Thus, we find that the trial court abused its discretion by entering the PPO because petitioner did not present evidence of stalking as required by MCL 600.2950a(1) and as defined by MCL 750.411h or MCL 750.411i, or conduct that is prohibited under MCL 750.411s. Petitioner failed to introduce evidence of a willful course of conduct in this matter, i.e., "two or more acts of unconsented contact that caused the victim to suffer emotional distress and that would cause a reasonable person to suffer emotional distress." *Hayford*, 279 Mich App at 330.

As noted earlier, in pertinent part, "stalking" refers to "a willful course of conduct involving repeated or continuing harassment,"[3] and "harassment" is "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress," but "does not include constitutionally protected activity or conduct that serves a legitimate purpose."[4] " '[C]onduct that serves a legitimate purpose' means conduct that contributes to a valid purpose that would otherwise be within the law irrespective of the criminal stalking statute." *Nastal v Henderson & Assoc Investigations, Inc*, 471 Mich 712, 723; 691 NW2d 1 (2005).

Filing a police report for purposes of reporting a legitimate dog bite or attack certainly "contributes to a valid purpose that would otherwise be within the law." Where such conduct does not serve that purpose and is instead a pretext intended to berate, harass, and threaten an individual, "that conduct would be outside the statutory safe harbor of MCL 750.411h(1)(c) and a civil action for stalking could be maintained."[5] See *id*. at 723-725. The trial court found that: (1) respondent accused petitioner's dog of biting her son's leg while they were walking in the neighborhood, (2) animal control subsequently determined that the dog did not bite respondent's child, and (3) petitioner felt threatened by respondent as a result of this incident. While the first two of these findings are supported by the record, a review of the hearing transcript reveals that petitioner never testified that he felt threatened by the incident in October 2023, nor did he allege in his petition that he felt threatened on that occasion.

Additionally, while there is no dispute that petitioner's dog did not puncture the skin of respondent's son, there is likewise no dispute that the dog jumped on respondent's son. Certainly, a person filing a police report as a result of their child being assaulted by another person's animal serves a legitimate government purpose. Thus, respondent's actions in filing a police report regarding the October 2023 incident fell within the safe harbor provision of MCL 750.411h(1)(d).

The record demonstrates that the initial contact between petitioner and respondent on October 17, 2023 was a chance encounter as each party was making use of the sidewalk to recreate, but respondent approaching petitioner and his dog a second time after calling the police while they were on their way home to make a report was not. Rather than simply avoiding interacting with petitioner again in light of their earlier encounter, petitioner testified that respondent approached to within one foot and AI within two feet of petitioner and his dog and again accused petitioner's dog of having bitten her son (which petitioner again denied). Further, respondent testified that she stopped her bicycle, said she was going to take a photograph of him "to show the officer exactly what you're doing," and directed him to pull the leash, which he did. This photograph shows petitioner with one of his feet on the lawn and the other on the sidewalk, holding his dog off the

---

[3] MCL 750.411h(1)(e).

[4] MCL 750.411h(1)(d).

[5] The safe harbor provision of MCL 750.411h was contained in subsection (c) at the time of the issuance of *Nastal*; however, as a result of a subsequent amendment to the statute, it is now contained in subsection (d).

-8-

edge of the sidewalk by his leash, with only 2-3 feet separating them from AI, who is on his scooter on the sidewalk next to them. Thus, this second encounter on the date in October 2023 constituted "contact with another individual that is initiated or continued without the individual's consent," in other words, an unconsented contact under MCL 750.411h(1)(f), and was arguably part of "repeated or continuing unconsented contact" to establish harassment under MCL 750.411h(1)(d) and stalking under MCL 750.411h(1)(e). However, as noted above, in order to prove that the unconsented contact constituted stalking, petitioner must present evidence showing that he was actually caused to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and there was no evidence supporting that assertion as it pertained to October 2023, including no such testimony or affidavit from petitioner.[6]

Respondent presents four additional arguments as to why the trial court erred by issuing the PPO, but because we have found that petitioner failed to present sufficient evidence of stalking, we need not address them.

Because we conclude that the trial court should not have issued the PPO, respondent is entitled to have LEIN[7] updated to reflect that fact. *TM v MZ*, 326 Mich App 227, 244; 926 NW2d 900 (2018).

We reverse the trial court's finding that petitioner met the burden of proof for the issuance of a PPO, vacate the PPO, and remand to the trial court with instructions that the PPO should be updated in LEIN as rescinded. *Id*. at 247. We do not retain jurisdiction.

/s/ Randy J. Wallace
/s/ Kristina Robinson Garrett
/s/ Matthew S. Ackerman

---

[6] We note that, while petitioner also implied that he was frightened on multiple other occasions when respondent passed by his house, as she walked through the neighborhood, the trial court did not include those other alleged incidents as part of the course of conduct upon which it relied for issuance of the PPO. We likewise find that, while there are certainly cases in which a respondent's actions in repeatedly walking past a petitioner's residence could cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, this is not one of them.

[7] LEIN is an acronym for the Law Enforcement Information Network.